IN THE
**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**
_____

IN THE MATTER OF J.C., A MINOR STUDENT,
BY AND THROUGH HIS PARENTS, J.C, AND J.C,
*Plaintiffs*,

v.

METROPOLITAN NASHVILLE PUBLIC SCHOOLS, AND
THE TENNESSEE DEPARTMENT OF EDUCATION,
*Defendants*,

NO. _____

Jury Demand
_____

# COMPLAINT
_____

COME THE PLAINTIFFS, J.C., a minor, by and through his parents, J.C., and J.C. They show:

## I. PARTIES, JURISDICTION, VENUE

1. J.C. is a minor child who, at times relevant hereto, attended Davidson County Schools. J.C. lives with his parents, J.C. (mother) and J.C. (father), and they reside in Davidson County.

2. The Tennessee Department of Education is the "State Education Agency" (SEA) which is legally responsible for ensuring that a free appropriate public education (FAPE) is provided to all students in the state of Tennessee. An "SEA" includes a public board of

1

education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, township, school district, or other political subdivision of a State [.]" 20 U.S.C. §1412(a)(1).

3. TDOE accepts federal funding and has for decades. TDOE is bound by Section 504 of the Rehabilitation Act, and by Title II of the Americans with Disabilities Act. By accepting federal funds under Section 504, TDOE waived its sovereign immunity.

4. Metropolitan Nashville Public Schools ("Metro Nashville") is the local education authority ("LEA"), a school system charged with ensuring a safe educational environment to students in Metropolitan Nashville including J.C. It receives federal financial assistance and is a public entity as defined in Title II of the Americans with Disabilities Act, and is obligated under Federal and Tennessee law to comply with special education laws, which provide behavioral supports to children with disabilities.

5. This Complaint involves differential and unequal treatment under Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794. This Complaint arises from non-educational abuse within a school, along with systemic inattentiveness to illegal restraints under Tennessee's Special Education Behavioral Supports Act, Tenn. Code Ann. 49-10-1304 et. seq.

6. This Court has subject matter jurisdiction under 28 U.S.C. §1331, Section 504, and the ADA, along with supplemental jurisdiction over state law claims, 28 U.S.C §1367.

7. Venue is proper under 28 U.S.C. §1391 because TDOE is the State Education Agency (SEA) which is located in Nashville, Tennessee and Metro Nashville is the Local

2

Education Agency (LEA), also located in Nashville, Tennessee. J.C. attended school in Nashville Tennessee.

8. Administrative exhaustion through the IDEA's state due process procedures is not required, nor would it be appropriate, in this case involving non-educational injuries and systemic failings by the LEA and SEA. Moreover, administrative exhaustion would be futile due to the nature of the wrongs being alleged—wrongs which emanate from the state level, wrongs for which state hearing officers lack authority to correct, wrongs for which state hearing officers cannot award damages, and wrongs under 504 and ADA which do not include educational programming under IDEA and for which a state hearing officer would lack jurisdiction. Moreover, requiring exhaustion would create an additional administrative barrier in cases of abuse not present for non-disabled children. [1] Finally, this action alleges non-educational injuries due to child abuse, not FAPE in the sense of educational programming per se, such that it is not subject to or appropriate for exhaustion.[2]

## II. FACTS

9. J.C. is a five year old child with autism. He is non-verbal.

10. J.C. is substantially limited in the major life activities of learning and communicating. Therefore, he is a child with a "disability" under 504 and the ADA.

11. Defendant, Metro Nashville, assigned J.C. to a classroom for students with significant special needs, many of whom had behavioral or emotional disorders. J.C. also received services from a speech and language therapist.

---

[1] *F.H. v. Memphis City Schools,* 764 F.3d 638, 644 (6th Cir. 2014).

[2] *Id.*

12. J.C.'s parents became alarmed when they observed large teeth imprints from an older person and accompanying bruises upon J.C.'s body. It was obvious that he was being left without appropriate supervision.

13. When J.C.'s parents inquired, Metro Nashville advised J.C.'s parents that the bite marks and accompanying bruises were self-inflicted—that J.C. had been biting himself. However, the very visible teeth and mouth imprints were larger than J.C.'s teeth or mouth would allow. Additionally, the upper and lower teeth marks were inverse, the opposite direction from J.C. biting himself.

14. J.C.'s parents equipped J.C. with a recording device for the next three days of school. The result captured unequal treatment of J.C. in the form of abuse, in comparison to non-disabled students. This constituted a clearly hostile educational environment.

15. In particular, Metro Nashville's speech and language therapist yelled at J.C., belittled J.C., ignored J.C., made inappropriate comments to J.C., engaged in dereliction of her job duties, and slammed J.C.'s head on his desk.

16. Metro Nashville's special education teacher engaged in unnecessary and inappropriate restraint in the form of a martial arts "pressure point" technique. The teacher boasted aloud that she was hurting J.C. more than he could hurt her. This caused J.C. to whimper and cry. The special education teacher stated that this is how you *handle them.* Upon information and belief, this special education teacher also illegally placed J.C. in a closely confined space for large periods of time.

17. J.C.'s parents have never approved any restraints or any martial arts pressure point techniques. Yet J.C. has been subjected to numerous unnecessary restraints and

4

pressure-pointing. These have been without parental notification, without procedural safeguards, without documentation, and without reporting to the parents.

18. J.C. has been bitten. He has been bruised. He has been banged. He has been barricaded. And he has been berated.

19. Thus, J.C. has experienced emotional and physical harm, distress, fearfulness, bouts of crying, resistance from school, and fear. His parents have experienced the emotional harm of hearing and witnessing the effect of abuse to their little boy.

20. The actions against J.C. were undertaken because of J.C.'s disability—intentionally, with deliberate indifference, in bad faith, and without regard for his federally protected rights.

21. J.C. clearly was not safe at school.

22. J.C.'s parents brought the matters to the attention of Metro Nashville. They advised Metro Nashville of the harm to J.C. On March 1, 2016, Metro Nashville responded in writing by accusing J.C. of being "truant" for not returning to the hostile educational environment and threatening legal action against them for being "in violation of" Tennessee's "Compulsory Attendance Law." Metro Nashville further stated this "will result in legal action being taken against you and your child." Metro Nashville did act with deliberate indifference.

23. Accordingly, in March of 2016, due to the harassment and the insufficient and retaliatory response by Metro Nashville, J.C.'s parents were forced to remove him from Metro Nashville public schools at their own cost and expense and hardship.

24. TDOE has an overarching supervisory obligation to monitor and oversee Metro Nashville non-discrimination against students with disabilities including appropriate

compliance with the Tennessee Special Education and Behavioral Support Act for purposes of ensuring equal treatment.  In these, it has woefully failed.

25. Under Title II of the ADA, students with a disability, including J.C., shall not be excluded from participation in, or be denied the benefits of the services, programs or activities of a public entity, or otherwise be subjected to discrimination. J.C., therefore, enjoys rights to a non-hostile educational environment equally to students without a disability.  TDOE and Metro Nashville are co-liable for ensuring his safety.

26. Under Section 504, similarly, Plaintiff enjoys equal access to educational services and a non-hostile educational environment.

27. To keep J.T. safe and in a positive environment, Tennessee passed the Special Education Behavioral Supports Act.  In important part, this Act has a purpose *to reduce dependency restraint practices* upon students with special needs within the public school systems. Tenn. Code Ann. 49-10-1302 *et. seq.*[3]

28. To do this, in Tennessee, school personnel may only restrain students with special needs in "emergency situations." *Id.* at 1304(a).

29. Where an "emergency" situation truly does exist, school personnel must evaluate the student's condition and notify the parent or guardian "the same day the isolation or restraint was used." *Id.* at 1304(d)(1).

---

[3] The entire purpose of the Act is to ensure that students, like J.T.., are "free from unreasonable, unsafe and unwarranted uses of isolation and restraint practices," "to encourage positive behavioral interventions and supports in schools," to "develop properly trained staff in order to promote positive behavioral supports that reduce dependence on isolation and restraint practices," and "to ensure that teachers...are properly trained to protect the student, teacher others from physical harm, if isolation or restraint is necessary." *Id*

6

30. School personnel who engage in an emergency restraint must report the matter to the school principal who shall record the use of the isolation or restraint and the facts surrounding it. *Id.* at 1304(e)(1).

31. To ensure consistency and to be able to meet the purposes of the Act, the State Board of Education is responsible for a "standard reporting format." *Id.* at 1304(e). TDOE created a standardized form called the "Tennessee Department of Education Report of Isolation/Restraint" to be used by schools.

32. This form requires schools to complete the following categories of information, among others: Time Isolation or Restraint began and ended; whether persons were certified for behavior intervention; witnesses; time the principal was notified; time the parent was notified; the "antecedent," defined as "the antecedents that immediately preceded the use of the isolation or restraint **and** the specific behavior being addressed"; the student's demeanor; whether the isolation space was "at least forty square feet"; whether injury or death occurred; whether property damage occurred; and whether student was temporarily released from being physically held.

33. Each year, local schools must submit their information on restraints and isolations to TDOE. TDOE, in turn, must report this information to "the State Advisory Council for the Education of Students with Disabilities." With the benefit of this information, the Advisory Council shall advise the State on unmet needs, consult with the Governor, Commissioner of Education, the State Board of Education and the Assistant Commissioner of the Division of Special Populations.

34. It is the duty of the Advisory Council, who has the information on restraints and isolations, to advise TDOE of how to reduce restraints. Finally, TDOE shall use these recommendations as well as the data to mete out the objectives of the Special Education

Behavior Support Act—"reduce or eliminate the use of isolation and restraint in schools." *Id.* at 1306(e).

35. TDOE, the Advisory Council, the Governor, the Commissioner of Education, and the Assistant Commissioner of the Division of Special Populations have all failed in their collective duties. The Advisory Council has not given, or TDOE has not accepted, recommendations on how to reduce restraints, or even ensure consistency among Tennessee school districts. In fact, minutes reveal the Advisory Council avoiding the issue of restraints, postponing the issue, or otherwise not confronting the manifold problems known to exist.

36. Publicly available isolation and restraint data show great inconsistencies, and a complete lack of uniformity, about circumstances involving the use of either restraints or isolations across Tennessee counties.

37. In 2014-2015, Metropolitan Nashville Public Schools' population included 9,867 students with disabilities. By comparison, Shelby County Public Schools' population included 13,888 students with disabilities. Metropolitan Nashville Public Schools self-reported committing **1,068 restraints** upon this population of students whereas Shelby County self-reported committing **266 restraints**.

38. TDOE is not taking sufficient preventive or deterrent action. With a lack of meaningful data, wildly different reports by schools, lack of meaningful progress monitoring, and lack of accountability taken by TDOE, Metropolitan Nashville Public Schools engaged in restraints upon J.C. which were:

- "unsafe, unreasonable, unwarranted,"
- not an "emergency,"
- conducted without informing parents in 24 hours,

8

- conducted without giving parents procedural safeguards, and
- lacking data of the antecedents contributing to the child's behavior.

39. As a proximate result of the inactions by TDOE, J.C. was the unwilling victim of illegal restraint and abuse which caused him physical injury and trauma, an experience different from non-disabled peers.

### III. LEGAL CLAIMS

40. Plaintiffs incorporate the foregoing paragraphs.

41. **Unequal Treatment and Hostile Environment Under 504 and Title II of the ADA.** Plaintiffs allege Defendants, Metro Nashville Schools and TDOE have failed to ensure that J.C. is treated equally in comparison to children without disabilities. Together, they have failed to deliver an educational experience for J.C. which is free from illegal restraints and isolations, thus resulting in a hostile educational experience for him under Section 504 and Title II of the ADA. Simply, being subjected to unnecessary restraint and abuse makes the school experience decidedly unequal. Defendants have been deliberately indifferent to all of these foreseeable harms.

42. **Retaliation Under 504 and Title II of the ADA.** Plaintiff alleges Metro Nashville Schools has subjected Plaintiff to retaliation under Section 504 and Title II of the ADA.

43. **State Law Claims.** Plaintiffs bring claims of negligence, gross negligence, negligence per se, false imprisonment, and battery against Metro Nashville Schools.

44. Wherefore, Plaintiff requests the Court:

   A. Issue a preliminary and permanent injunction:

- i. Directing TDOE to monitor and correct failure to timely notify parents of restraints or other abuses within Metro Nashville Schools;
- ii. Directing TDOE to monitor and correct Metro Nashville from using restraints or abuse as a matter of convenience.
- iii. Issue a Declaratory Judgment on behalf of Plaintiff declaring the actions, policies, and practices as alleged herein violate the governing laws; and

b. Award:
- i. Appropriate damages to Plaintiffs for harm suffered under the applicable statutes;
- ii. Plaintiffs their costs and attorneys fees; and

c. Other:
- i. Grant any such other and further non-educational relief, at law or equity, which may be appropriate in the eyes of the Court;
- ii. And impanel a jury to hear all causes where a jury is permitted.

Respectfully Submitted,

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT, PLC**

 /Justin S. Gilbert_____
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 504
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

***ATTORNEYS FOR PLAINTIFFS***